# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SAJ DISTRIBUTORS, INC., and STEPHEN L. LaFRANCE HOLDINGS, INC.**<br><br>**Plaintiffs,**<br><br>v.<br><br>**WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., GALEN (CHEMICALS) LTD., and BARR PHARMACEUTICALS, INC.,**<br><br>**Defendants.** | **Civ. Action No. 1:05-CV-02459-CKK** |

## BARR PHARMACEUTICALS' ANSWER TO
## PLAINTIFFS' CLASS ACTION COMPLAINT

Defendant BARR PHARMACEUTICALS, INC. ("Barr") hereby responds to the allegations of plaintiffs SAJ DISTRIBUTORS, INC. and STEPHEN L. LaFRANCE HOLDINGS, INC. ("Plaintiffs") in their purported Class Action Complaint ("Complaint"), by denying it has engaged or is engaging in any unlawful or unfair methods of competition in or affecting commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Barr further responds to each paragraph of the Complaint as set forth below. Any allegation in the Complaint not specifically addressed below is hereby denied.

1.      Plaintiffs, SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc. (collectively "Plaintiffs"), bring this antitrust action against Defendants for violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, in the market for generic Ovcon 35 ("Ovcon").

**ANSWER:**     Barr admits that plaintiffs' Complaint purports to bring an antitrust action.  Barr denies the remaining allegations contained in Paragraph 1 of the Complaint.

2.     Plaintiffs bring this lawsuit as a class action on behalf of all individuals and entities that purchased Ovcon from April 22, 2004 to a date to be determined ("the Class Period") in the United States directly from Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., or Galen (Chemicals) Ltd. (collectively "Warner Chilcott").  Warner Chilcott and Barr Pharmaceuticals, Inc. ("Barr") are hereinafter referred to as "Defendants" unless otherwise specified.  Plaintiffs allege that Defendants illegally agreed to keep a generic version of Ovcon off the market, preventing Plaintiffs from purchasing this less expensive product.

**ANSWER:**     Paragraph 2 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr denies each and every allegation contained in the last sentence of Paragraph 2 of the Complaint and further denies that this suit can be maintained as a class action.

3.     The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.  Venue is proper within this District under 15 U.S.C. § 22.

**ANSWER:**     Paragraph 3 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr denies the allegations contained in the first sentence of Paragraph 3 of the Complaint and lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence of Paragraph 3 of the Complaint.

4.     Plaintiff Stephen L. LaFrance Holdings, Inc. ("LaFrance") is a holding company with interests in retail and wholesale drug stores and distribution.  LaFrance's corporate office is located in Pine Bluff, Arkansas.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 4 of the Complaint.

5.     Plaintiff SAJ Distributors, Inc. ("SAJ") is a wholly owned subsidiary of LaFrance and is LaFrance's distribution company with interests in retail and wholesale drug distribution.  SAJ's corporate office is located in Pine Bluff, Arkansas.  SAJ and LaFrance ("Plaintiffs") are the assignees of McKesson Corp., which purchased Ovcon directly from the Defendant and was injured by the illegal conduct alleged herein.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 5 of the Complaint, but specifically denies that plaintiffs suffered any injury whatsoever.

6.    Defendant Warner Chilcott Holdings Company III, Ltd. is a privately owned, for-profit company organized, existing, and doing business under and by virtue of the laws of Barbuda, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 6 of the Complaint.

7.    Warner Chilcott Holdings Company III, Ltd., through its direct and indirect subsidiaries, is engaged in the discovery, development, manufacturing, and distribution of pharmaceutical products in the United States, including Ovcon.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 7 of the Complaint.

8.    Defendant Warner Chilcott Corporation is a wholly owned indirect subsidiary of Warner Chilcott Holdings Company III, Ltd., and is the direct 100% shareholder of Warner Chilcott (U.S.) Inc.   Warner Chilcott Corporation is organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 8 of the Complaint.

9.    Defendant Warner Chilcott (U.S.) Inc. is a wholly owned subsidiary of Warner Chilcott Corporation.   Warner Chilcott (U.S.) Inc. is organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 9 of the Complaint.

10.    Defendant Galen (Chemicals) Ltd. is organized, existing, and doing business under and by virtue of the laws of the Republic of Ireland.  Galen Chemicals is directly owned or controlled by Warner Chilcott Holdings Company III, Ltd.  Galen Chemicals entered into the anticompetitive agreement that prevents Barr's generic Ovcon entry challenged herein.

**ANSWER:**    Barr admits that it executed an Option and License Agreement with Galen (Chemicals) Ltd., but denies the remaining allegations contained in the last sentence of Paragraph 10 of the Complaint.  Barr lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 10 of the Complaint.

11.    Collectively, Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (U.S.), and Galen (Chemicals) Ltd. are known hereinafter as the "Warner Chilcott Defendants."

**ANSWER:**    Paragraph 11 of the Complaint contains legal conclusions to which no response is required.

12.    Defendant Barr is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware.  Barr's office and principal place of business is located at 2 Quaker Road, P.O. Box 2900, Pomona, New York 10970-0519.

**ANSWER:**    Barr admits that it is a corporation organized under the laws of the State of Delaware.  Barr denies the remaining allegations contained in Paragraph 12 of the Complaint.

13.    Barr is engaged in the business of, among other things, developing, manufacturing, marketing, and distributing generic oral contraceptive products.  In the twelve months ending June 30, 2004, Barr had net revenues of approximately $349 million and net income of approximately $123 million.

**ANSWER:**    Barr admits that it is a pharmaceutical company whose regular business activities include the development, manufacture, and marketing of various pharmaceutical products.  Barr denies the remaining allegations contained in Paragraph 13 of the Complaint.

14.    The relevant product market is the market for the sale of Ovcon 35 and its AB rated generic equivalents.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 14 of the Complaint.

15.    The relevant geographic market is the United States as a whole.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 15 of the Complaint.

16.    At all relevant times, Warner Chilcott's market share in the relevant product and geographic markets was 100%.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 16 of the Complaint.

17.    The Federal Food, Drug and Cosmetic Act ("FDCA") regulates the manufacture and distribution of drugs and medical devices in the United States, 21 U.S.C. § 301 *et seq.* Under the FDCA, premarket approval by the Food and Drug Administration ("FDA") is required before a company may begin selling a new drug, often referred to as a "pioneer" or "branded" drug, in interstate commerce in the United States. 21 U.S.C. § 355(a). Premarket approval for a new drug must be sought by filing a new drug application ("NDA") with the FDA under § 355(b) of the FDCA, demonstrating that the drug is safe and effective for its intended use.

**ANSWER:**    Paragraph 17 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Barr admits that, among other things, a drug manufacturer must obtain approval from the FDA before a manufacturer may lawfully introduce a new drug in the United States. Barr further admits that, among other things, a drug manufacturer must file a New Drug Application with the FDA and demonstrate that a new drug is safe and effective for its intended use. Barr lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 17 of the Complaint.

18.    Once the FDA approves the safety and effectiveness of a new prescription drug, it may be used in the United States only under the direction and care of a doctor who writes a prescription specifying the drug, which must be purchased from a licensed pharmacist. The pharmacist will then dispense the drug specified by the physician unless a generic version is available that has been approved by the FDA for substitution as the bioequivalent of the prescription drug.

**ANSWER:**    Paragraph 18 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Barr admits that in some states and

under certain circumstances a pharmacist may dispense a generic drug when presented with a

prescription for its branded equivalent, but lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations contained in Paragraph 18 of the Complaint.

19.    Generic drugs are drugs that the FDA has found to be "bioequivalent" to their corresponding brand name drugs. A generic drug is bioequivalent if it provides the identical therapeutic benefits and has the same active chemical composition as its brand name counterpart. When a generic drug is completely equivalent to a brand name drug, the FDA assigns the generic drug an "AB" rating.

**ANSWER:**    Paragraph 19 of the Complaint contains legal conclusions to which

no response is required. To the extent a response is required, Barr lacks knowledge or

information sufficient to form a belief as to the truth of each and every allegation contained in

Paragraph 19 of the Complaint.

20.    Generic drugs are invariably priced substantially below the branded drugs to which they are bioequivalent. Typically, the first generic drug is sold at a modest discount compared to the brand name drug, with discounts increasing as more companies begin selling the generic. As additional generic competitors come to market, the price of the generic equivalents continues to fall, and the combined market share of the generic manufacturers continues to grow. In some cases, generic competitors sell products equivalent to brand name prescription drugs for as little as 15 percent of the price of the brand name drug, and capture as much as 90 percent of the market for that drug. Unless the branded manufacturer lowers prices to meet competition, a branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition.

**ANSWER:**    Barr admits that generic drugs can cost less than bioequivalent

branded drugs but that each drug must be considered individually to observe pricing behavior.

Barr lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 20 of the Complaint.

21.    Moreover, if a lower-priced generic version of a brand name drug exists, and the physician has not specifically indicated on the prescription "dispense as written" (or a similar instruction), typically, the pharmacist will substitute, or at least offer to substitute, the generic drug.

**ANSWER:**    Barr admits that in some states and under certain circumstances a

pharmacist may dispense generic drugs when presented with a prescription for its branded

equivalent, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 21 of the Complaint.

22.    Once a physician writes a prescription for a brand name drug such as Ovcon, that prescription defines and limits the market to the brand name drug or its AB-rated generic equivalent.  A pharmacist may substitute only drugs that carry the FDA's AB generic rating for a physician's prescription for a brand name drug.

**ANSWER:**    Paragraph 22 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr admits that in some states and under certain circumstances a pharmacist may dispense generic drugs when presented with a prescription for its branded equivalent.  Barr denies the remaining allegations contained in Paragraph 22 of the Complaint.

23.    The Hatch-Waxman Amendments provide that companies may seek approval to produce and market a generic form of a previously approved or "pioneer" drug by filing an Abbreviated New Drug Application ("ANDA") that relies on the safety and effectiveness findings reported in the NDA for the previously approved drug.

**ANSWER:**    Paragraph 23 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr admits that the Hatch-Waxman Act establishes certain procedures relating to generic pharmaceuticals.  Barr lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 23 of the Complaint.

24.    This case is about an illegal agreement not to compete in the market for the drug Ovcon 35 and its AB rated generic equivalents, made between a brand name drug manufacturer, Warner Chilcott, and its only prospective generic competitor, Barr.

**ANSWER:**    Paragraph 24 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr denies each and every allegation contained in Paragraph 24 of the Complaint.

25.    Ovcon 35, an oral contraceptive, was introduced in 1976.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as

to the truth of each and every allegation contained in Paragraph 25 of the Complaint.

26.     Warner Chilcott acquired the rights to Ovcon from Bristol-Myers Squibb
Company in February 2000.  Bristol-Myers Squibb Company agreed to and has supplied Ovcon
to Warner Chilcott since that time.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as

to the truth of each and every allegation contained in Paragraph 26 of the Complaint.

27.     Ovcon is not subject to any patent protection.

**ANSWER:**     Barr admits that it is unaware of any claims of patent protection on

Ovcon.

28.     As one of Warner Chilcott's highest revenue-producing products, Ovcon
is a valuable asset to the company.  For the fiscal year ending September 30, 2003, product
revenue for Ovcon was $58.6 million dollars, making Ovcon one of the company's top three
performing products.  In 2005, Ovcon product revenue for three months was $22.8 million
dollars, up $5.4 million from 2004, which reflected a 30.8% increase in product revenue.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as

to the truth of each and every allegation contained in Paragraph 28 of the Complaint.

29.     Warner Chilcott sells Ovcon at a price considerably above its cost of
acquiring the product.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as

to the truth of each and every allegation contained in Paragraph 29 of the Complaint.

30.     In September 2001, Barr filed an ANDA with the FDA for approval to sell
an AB-rated generic version of Ovcon 35.

**ANSWER:**     Barr admits that it filed an ANDA with the FDA for approval to

manufacture and sell an AB-rated generic version of Ovcon.  Barr denies the remaining

allegations contained in Paragraph 30 of the Complaint.

31.     In January 2003, planning to vie for a portion of the Ovcon market by
selling its generic Ovcon at roughly 30% less than the price of Warner Chilcott's branded Ovcon,
Barr publicly announced its intention to market generic Ovcon once it received FDA approval.

**ANSWER:**    Barr denies the allegations contained in Paragraph 31, except admits that in April 2004 it publicly contemplated launching a generic version of Ovcon if Warner Chilcott did not exercise its option, subject to certain risks and uncertainties in making a generic Ovcon commercially available.

32.    The potential entry of Barr's lower priced generic Ovcon threatened to diminish Warner Chilcott's branded Ovcon sales by roughly 50% in the first year alone.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 32 of the Complaint.

33.    By Warner Chilcott's projections, its net revenues from the sale of branded Ovcon would decline by at least $100 million over a three-year period as a result of prescriptions lost to generic Ovcon.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 33 of the Complaint.

34.    Warner Chilcott planned to protect its Ovcon revenues from generic competition by introducing Ovcon Chewable, a chewable form of branded Ovcon, before generic entry occurred.  However, it became unlikely that the FDA would finally approve the chewable product in time.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 34 of the Complaint.

35.    In May 2003, Warner Chilcott's chief financial officer suggested to the company's Board of Directors that generic Ovcon entry was the "biggest risk to the company."

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 35 of the Complaint.

36.    In August 2003, Barr and Warner Chilcott discussed a possible business arrangement under which Barr would agree to refrain from competing in the United States with its generic Ovcon product.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 36 of

the Complaint, except admits that in August 2003 representatives of Barr and Warner Chilcott

discussed a number of possible business transactions.

37.    On September 10, 2003, Warner Chilcott and Barr executed a letter of
intent, which formed the basis of the anticompetitive agreement.    Under the letter of intent,
Warner Chilcott would pay Barr $20 million in exchange for Barr agreeing not to compete in the
United States for five years with its generic Ovcon product when Barr received final FDA
approval.    Instead, Barr would agree to be available as a second supplier of Ovcon to Warner
Chilcott with Bristol Myers Squibb if Warner Chilcott so requested.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 37 of

the Complaint, except admits that on September 10, 2003, Barr and Warner Chilcott executed a

letter of intent to enter into an agreement that would give Warner Chilcott an option to enter into

a five-year exclusive license to Barr's Ovcon ANDA and a related supply agreement.

38.    In February 2004, Federal Trade Commission staff notified Warner
Chilcott and Barr that it intended to investigate the agreement outlined in their letter of intent
because of its significant potential to reduce competition by preventing the only generic
alternative to Ovcon from entering the market.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 38 of

the Complaint, except admits that in February 2004, FTC staff advised Barr that it intended to

investigate the Ovcon transactions outlined in the letter of intent between Warner Chilcott and

Barr.

39.    In March 2004, Defendants signed their Final Agreement implementing
the letter of intent.    For $1 million, Barr granted Warner Chilcott an option to acquire a five-year
exclusive license under Barr's ANDA for which Ovcon is the reference drug.    If Warner Chilcott
chose to exercise the option agreement, Warner Chilcott would pay Barr an additional $19
million.

**ANSWER:**    Barr admits that on March 24, 2004, Barr and Warner Chilcott

executed an option agreement implementing the terms of the parties' letter of intent, and that

Barr was paid $1 million in consideration for the option by Warner Chilcott.    Barr further admits

that Warner Chilcott exercised its option to a five-year exclusive license to Barr's Ovcon ANDA in May 2004.

40.    The FDA approved Barr's ANDA to produce and market generic Ovcon on April 22, 2004 at which time Barr had the capability to market generic Ovcon in the United States. On April 23, 2004 Barr publicly announced its intention to market generic Ovcon if Warner Chilcott chose not to exercise its exclusive license option.

**ANSWER:**    Barr admits that on April 22, 2004, the FDA approved Barr's ANDA to produce and market generic Ovcon, and admits that in April 2004 it publicly contemplated launching a generic version of Ovcon if Warner Chilcott chose not to exercise its option, subject to certain risks and uncertainties in making a generic Ovcon commercially available. Barr denies the remaining allegations contained in Paragraph 40 of the Complaint.

41.    On May 4, 2004, Warner Chilcott exercised its option and paid Barr the additional $19 million. At the same time, Warner Chilcott entered into a finished-product supply agreement with Barr under which Barr agreed to provide Warner Chilcott with its requirements for finished products throughout the term of the license. Barr has begun supplying Ovcon to Warner Chilcott and will be Warner Chilcott's sole source of supply for the product.

**ANSWER:**    Barr admits that in May 2004, Warner Chilcott exercised its option to a five-year exclusive license to Barr's Ovcon ANDA, that Warner Chilcott paid Barr $19 million under the Final Agreement. Barr further admits that Barr and Warner Chilcott entered into a supply agreement with specified payment terms, and that Warner Chilcott began purchasing Ovcon from Barr in May 2005. Barr lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 41 of the Complaint.

42.    Without the agreement, Barr would have started selling generic Ovcon shortly after receiving final FDA approval in April 2004.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 42 of the Complaint.

43.    The Final Agreement prohibits Barr from selling generic Ovcon for five years, or until approximately May 2009. At the end of the five-year term, Warner Chilcott can extend the license on a non-exclusive basis for an additional five-year period.

**ANSWER:**    Barr admits that until approximately May 2009, Barr is obligated to supply Warner Chilcott exclusively with product produced under Barr's ANDA on generic Ovcon. Barr further admits that Warner Chilcott may renew the supply agreement on a non-exclusive basis for an additional five-year period after 2009. Barr denies the remaining allegations contained in Paragraph 43 of the Complaint.

44.    Instead of competing, Defendants agreed to a horizontal market allocation and have committed a *per se* violation of the Sherman Act. Defendants agreed to allocate the entire market for Ovcon to Warner Chilcott with Barr as the sole supplier. This agreement has robbed purchasers of the choice of a lower-cost generic alternative to Warner Chilcott's higher-priced branded Ovcon 35.

**ANSWER:**    Paragraph 44 contains legal conclusions to which no response is required. To the extent a response is required, Barr denies each and every allegation contained in Paragraph 44 of the Complaint.

45.    No other pharmaceutical companies are approved by the FDA to sell a generic version of Ovcon.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 45 of the Complaint.

46.    The agreement between Warner Chilcott and Barr has harmed class members by preventing them from purchasing a lower priced generic version of Ovcon and allowed Defendants to reap supra-competitive prices.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 46 of the Complaint, and specifically denies that plaintiffs have suffered any harm whatsoever.

47.    Plaintiffs bring this action on their own and, under Rule 23(b)(3) of the Federal Rules of Civil Procedure, with respect to damages sought herein, as representatives of a class (the "Class") defined as follows:

> All individuals or entities in the United States that directly purchased Ovcon 35 from the Warner Chilcott Defendants

or their subsidiaries at any time from April 22, 2004 until at
least the date of filing.

Excluded from the above classes are governmental entities and Defendants and their respective subsidiaries and affiliates.

**ANSWER:**     Paragraph 47 of the Complaint contains legal conclusions to which no response is required.   To the extent a response is required, Barr denies each and every allegation contained in Paragraph 47 of the Complaint, and specifically denies that this suit can be maintained as a class action under Rule 23(b)(3) or any other rule.

48.     While the exact size of the Class is unknown to Plaintiffs at the present time, the members of the Class are believed to number in the hundreds and they are geographically dispersed throughout the United States.   Thus, members of the Class are numerous and joinder is impracticable.

**ANSWER:**     Paragraph 48 of the Complaint contains legal conclusions to which no response is required.   To the extent a response is required, Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 48 of the Complaint, but specifically denies that this suit can be maintained as a class action.

49.     Plaintiffs' claims are typical of the Class.   Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

**ANSWER:**     Paragraph 49 of the Complaint contains legal conclusions to which no response is required.   To the extent a response is required, Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 49 of the Complaint, but specifically denies that Barr engaged in any wrongful conduct or that plaintiffs suffered any injury whatsoever.

50.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.   The interests of Plaintiffs are not antagonistic to the Class.

**ANSWER:**    Paragraph 50 of the Complaint contains legal conclusions to which no response is required.    To the extent a response is required, Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 50 of the Complaint, but specifically denies that this suit can be maintained as a class action.

51.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 51 of the Complaint, but specifically denies that this suit can be maintained as a Class action.

52.    Questions of law and fact common to the Class include:

(a)    Whether the agreement is a *per se* violation of the Sherman Act;

(b)    Whether the agreement caused prices to be at artificially high and non-competitive levels; and

(c)    Whether Plaintiffs and other Class members were injured by the agreement and, if so, the appropriate class-wide measure of damages.

**ANSWER:**    Paragraph 52 of the Complaint contains legal conclusions to which no response is required.    To the extent a response is required, Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 52 of the Complaint, but specifically denies that plaintiffs suffered any injury or that plaintiffs are entitled to any relief whatsoever.

53.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.

**ANSWER:**    Paragraph 53 of the Complaint contains legal conclusions to which no response is required.    To the extent a response is required, Barr lacks knowledge or

information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 53 of the Complaint, but specifically denies that this suit can be maintained as a class action.

54.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action as a class action.

**ANSWER:**     Paragraph 54 of the Complaint contains legal conclusions to which no response is required.   To the extent a response is required, Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 54 of the Complaint, but specifically denies that this suit can be maintained as a class action.

55.     Defendants engaged in unlawful combination and conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to allocate the market for Ovcon by eliminating generic competition, causing damage to Plaintiffs and the Class members.

**ANSWER:**     Paragraph 55 of the Complaint contains legal conclusions to which no response is required.   To the extent a response is required, Barr denies each and every allegation contained in Paragraph 55 of the Complaint, and specifically denies that plaintiffs suffered any injury whatsoever.

## DEFENSES

In addition to the foregoing responses, Barr asserts the following defenses to the claims alleged in plaintiffs' Class Action Complaint.  Barr does not assume the burden of proof on these defenses where the applicable substantive law provides otherwise.

### First Affirmative Defense

1.     Plaintiffs' Complaint fails to state a claim against Barr upon which relief can be granted.

### Second Affirmative Defense

2.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

### Third Affirmative Defense

3.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

### Fourth Affirmative Defense

4.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

### Fifth Affirmative Defense

5.      Plaintiffs' claims are barred, in whole or in part, because any conduct engaged in by Barr has been reasonable, based upon independent, legitimate business and economic justifications, and was taken without the purpose or effect of injuring competition.

### Sixth Affirmative Defense

6.      Plaintiffs' claims are barred, in whole or in part, because any conduct engaged in by Barr was reasonable in relation to the development and preservation of its business.

### Seventh Affirmative Defense

7.      Plaintiffs' claims are barred, in whole or in part, because none of Barr's actions have injured competition in any relevant market.

### Eighth Affirmative Defense

8.      Plaintiffs' claims are barred, in whole or in part, because Barr's actions have pro-competitive effects that benefit competition as a whole in any relevant market.

### Ninth Affirmative Defense

9.    Plaintiffs' claims are barred, in whole or in part, because none of Barr's actions have harmed competition and/or consumers.

### Tenth Affirmative Defense

10.    Plaintiffs' claims are barred, in whole or in part, because Barr had no knowledge, intention, notice or belief that Barr's actions might illegally restrain trade. Further, Barr could not have known that its actions might illegally restrain trade.

### Eleventh Affirmative Defense

11.    Plaintiffs' claims are barred, in whole or in part, because Barr did not engage in any willful or flagrant act.

### Twelfth Affirmative Defense

12.    Plaintiffs' claims are barred, in whole or in part, because Barr relied in good faith on the actions and statements of the Federal Trade Commission.

### Thirteenth Affirmative Defense

13.    Plaintiffs' claims are barred, in whole or in part, because Barr did not conceal any of its actions.

### Fourteenth Affirmative Defense

14.    Plaintiffs' claims are barred, in whole or in part, because Barr did not engage in any pattern or practice of illegal activity.

### Fifteenth Affirmative Defense

15.    Plaintiffs' claims are barred, in whole or in part, because Barr's actions were the result of a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error.

### Sixteenth Affirmative Defense

16.    Plaintiffs' claims are barred, in whole or in part, because Barr's actions did not cause harm to plaintiffs.

### Seventeenth Affirmative Defense

17.    Plaintiffs' claims are barred, in whole or in part, because Barr did not engage in any unfair or deceptive act or practice.

### Eighteenth Affirmative Defense

18.    Plaintiffs' claims are barred, in whole or in part, because plaintiffs have not properly alleged either a relevant product market or a relevant geographic market.

### Nineteenth Affirmative Defense

19.    Plaintiffs' claims are barred, in whole or in part, because Barr has no market power and plaintiffs have failed to allege any market power.

### Twentieth Affirmative Defense

20.    Plaintiffs' claims are barred, in whole or in part, because plaintiffs do not have standing.

### Twenty-First Affirmative Defense

21.    Plaintiffs' claims are barred, in whole or in part, because plaintiffs have not suffered antitrust injury.

### Twenty-Second Affirmative Defense

22.    Plaintiffs' claims are barred, in whole or in part, because the action against Barr is not properly maintained as a class action.

### Twenty-Third Affirmative Defense

23.     To the extent that plaintiffs have failed to mitigate, minimize, or avoid any loss or damage referred to in the Complaint, any recovery must be reduced by that amount.

### Twenty-Fourth Affirmative Defense

24.     Plaintiffs' claims are barred, in whole or in part, because Barr has acted at all times in conformity with all applicable laws, statutes, ordinances and decrees with respect to plaintiffs.

### Twenty-Fifth Affirmative Defense

25.     Barr reserves the right to assert and rely on other applicable defenses as may become available or apparent, to amend its answer and/or defenses, and/or delete defenses that it determines to be inapplicable.

## JURY DEMAND

Barr hereby demands trial by jury on all claims so triable.


## PRAYER FOR RELIEF

Wherefore, Barr prays as follows:

1.     That the Court enter judgment for Barr;

2.     That the Court award Barr reasonable costs and expenses including, but not limited to, attorneys' fees and costs of suit, and such other and further relief as may be appropriate.


Date:   March 8, 2006

Respectfully submitted,

Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Chong S. Park (D.C. Bar # 463050)

KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C.  20005
Tel. (202) 879-5000
Fax (202) 879-5200

*Attorneys for Defendant*
*Barr Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that on March 8, 2006, the undersigned attorney caused a true and correct copy of the foregoing DEFENDANT BARR PHARMACEUTICALS' ANSWER TO PLAINTIFFS' CLASS ACTION COMPLAINT in Civil Action No. 1:05-CV-02459-CKK to be served on the following counsel of record by First Class Mail.

_____
Karen N. Walker

Dianne M. Nast
RODANAST, P.C.
801 Estelle Drive
Lancaster, Pennsylvania  17601

Michael L. Roberts
ROBERTS LAW FIRM, P.A.
P.O. Box 241790
20 Rahling Circle
Little Rock, Arkansas  72223-1790

Michael D. Hausfeld
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
West Tower, Suite 500
1100 New York Avenue, N.W.
Washington, District of Columbia  20005

*Counsel for SAJ Distributors, Inc.*
*and Stephen L. LaFrance Holdings, Inc.*